Judith Elkin (NY Bar No. 4249439)
HAYNES AND BOONE, LLP
30 Rockefeller Plaza
26th Floor
New York, NY 10112
Telephone: 212.659.7300
Facsimile: 212.918.8989
Email: judith.elkin@haynesboone.com

COUNSEL FOR DR. MARTIN PRAGER,
IN HIS CAPACITY AS INSOLVENCY
ADMINISTRATOR FOR DR. JÜRGEN
TOFT

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | |
| ) | Chapter 15 |
| DR. JÜRGEN TOFT, ) | |
| ) | CASE NO.11-11049 (    ) |
| Debtor in a Foreign Proceeding. ) | |

**DECLARATION OF FOREIGN REPRESENTATIVE
AND STATEMENT PURSUANT TO 11 U.S.C. § 1515**

I, Dr. Martin Prager, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the duly appointed Insolvency Administrator and foreign representative of Dr. Jürgen Toft (the "Debtor"), a foreign individual against whom an insolvency proceeding (the "Munich Proceeding") was initiated in the Munich District Insolvency Court (the "MDIC") in accordance with the German Insolvency Law from October 5, 1994.

2. I have read the Petition and, knowing the contents thereof, verify that the all facts set forth therein are true and correct based on my personal knowledge.

2. I was appointed as the Interim Insolvency Administrator of the Debtor by the MDIC on June 10, 2010. After conducting an interim analysis of the Debtor's business and reporting to the MDIC on the Debtor's center of main interests ("COMI"), a full main bankruptcy proceeding was opened in the MDIC on September 27, 2010, and I was appointed to

be the Debtor's Insolvency Administrator. The September 27, 2010 proceeding is a foreign proceeding as defined in 11 U.S.C. § 101(23) of the United States Bankruptcy Code. The Munich Proceeding is a judicial proceeding, administered by the MDIC, filed pursuant to the German Insolvency Law from October 5, 1994, which is a law relating to the insolvency and adjustment of debts in which the assets and affairs of the debtor are subject to the control and supervision of the court, for the purpose of liquidation.

3. In furtherance of my duties as Insolvency Administrator, I have commenced two other insolvency proceedings against the Debtor. A foreign nonmain proceeding was commenced by me in the local court of Appenzell in Switzerland by an order on November 3, 2010. A foreign nonmain proceeding was commenced by me in the High Court of Justice in London, England on January 28, 2011.

5. The German, Swiss, and English proceedings are the only foreign proceedings with respect to the Debtor known to me.

6. Attached to this Declaration is the Witness Statement of Dr. Martin Prager and accompanying exhibits as it was submitted to the court in England. Everything set forth therein is true and correct based on my personal knowledge unless otherwise specified therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed this _____ day of March, 2011.

_____
Dr. Martin Prager,
In His Capacity as Insolvency
Administrator for Dr. Jürgen Toft

# EXHIBIT "A"

Applicant
M. Prager
First
MP1
Date:

Application No._____

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
IN BANKRUPTCY

IN THE MATTER OF DR JÜRGEN TOFT
AND IN THE MATTER OF THE INSOLVENCY ACT 1986
AND IN THE MATTER OF THE EC REGULATION ON INSOLVENCY
PROCEEDINGS 2000

BETWEEN

DR MARTIN PRAGER

(as trustee in bankruptcy for the First Respondent)

<u>Applicant</u>

-and-

(1) DR JÜRGEN TOFT
(a bankrupt)
(2) ROYAL MAIL GROUP LTD
(3) HSBC BANK PLC

<u>Respondents</u>

## WITNESS STATEMENT OF
## DR MARTIN PRAGER

I, **DR MARTIN PRAGER**, of Barthstr. 16, 80339 Munich will say as follows:-

1. I am a lawyer qualified in Germany and a director of Pluta Rechtsanwalts GmbH ("Pluta"). Pluta is a professional services firm (legal and accountancy) with 23 offices in Germany and offices in Italy and Spain. I am fluent in English. I was appointed as the Interim Insolvency Administrator (Vorläufiger

Insolvenzverwalter) of the First Respondent, Dr Jürgen Toft ("Dr Toft") by the Munich District Insolvency Court (Amtsgericht München - Insolvenzgericht) ("MDIC") on 10 June 2010. Full main bankruptcy proceedings were opened in the MDIC on 27 September 2010, and I was appointed to be Dr Toft's Insolvency Administrator (Insolvenzverwalter). An Insolvency Administrator is the German equivalent of an English Trustee in Bankruptcy. I make this application in the capacity as Dr Toft's Insolvency Administrator for:

1.1. a declaration that the order of Judge Wolfrum sitting in the MDIC, dated 21 July 2010 ("the Munich Order") (as set out in the MDIC Order of 27 September 2010 paragraph 7) is enforceable within England and Wales without further formality;

1.2. alternatively, in the event that the declaration sought is not granted, an order under section 371 of the Insolvency Act 1986 ("the Act") that the Second Respondent, Royal Mail Group Ltd ("Royal Mail") redirecting the First Respondent's English post on the same terms as the Munich Order (as it relates to his post);

1.3. an order, pursuant to section 365 of the Act that I may search Dr Toft's residential address in England, Flat 1, 17 Chesham Place, London, SW1X 8HJ ("the Property") and seize any property comprised in his bankruptcy estate, and any books, papers or records relating to his bankruptcy; and

1.4. an order, pursuant to section 366 of the Act that the Fourth Respondent, HSBC Bank plc ("the Bank") delivers to me any information it has concerning Dr Toft's dealings, affairs and property and produces all books, papers and records relating to Dr Toft's accounts held with it.

2. Save where the contrary appears, this statement is based on my own knowledge acquired while acting as Dr Toft's Interim Insolvency Administrator and Insolvency Administrator and the matters stated are true. Where I set out information received from others or where such information is not within my knowledge, I believe it to be true.

3. There is now produced and shown to me a paginated bundle of documents marked "MP1" to which I will refer in this statement. References to documents within MP1 are to tab numbers within which will be the document and where applicable an English translation of it.

**NOTICE**

4. Notice of this application has been given to the Bank [1]. Notice has not been given to Royal Mail as I am advised that mail redirection orders are frequently granted without notice under section 371 of the Act.

5. It is not intended to give notice to AOL (UK) Limited ("AOL") or GMX Internet Services Inc ("GMX") since there is no relief sought against them. Although the Munich Order relates to internet services operated by them, the relief sought is merely recognition of the Munich Order. No new relief is sought against these parties, since in the event that declaration is not granted, only an order against the Royal Mail is sought under the Act. In the event that the Court believes that AOL or GMX ought to have an opportunity to contest the judicial recognition of the Munich Order, it is humbly requested that the declaration sought is granted, but on the terms that AOL or GMX be provided with notice of such declaration and may apply to have it set aside.

6. Notice of this application has not been given to Dr Toft. The reason for this is that, given his previous conduct, I am of the view that if he were informed of this application he would undertake steps to dispose of his assets within this jurisdiction and/or frustrate or prevent my seizing or otherwise obtaining the emails, letters, books, papers and records sought by this application. The previous conduct upon which I rely for these purposes is set out later in this statement.

7. Further, given the nature of the relief sought, and the fact that Dr Toft could avoid the effects of the relief sought by simply avoiding using the Royal Mail, AOL, GMX and the Bank for his activities, it is intended that he should not, even in the event that orders are made, be served with a copy of this application, nor the evidence or orders made

## QUALIFICATIONS

8. I am a lawyer qualified in Germany. I was admitted to the German bar in 1983. I hold degrees in law and economics from the University of Freiburg and Geneva respectively and a Ph.D equivalent from the University of Bremen. Since June 1998, I have been practising as an insolvency practitioner for several district insolvency courts. The main ones are in Munich, Weilheim, Augsburg, Nürnberg, Bayreuth and Regensburg. I have handled some 1,425 (individual and corporate) cases in my career to date.

## BACKGROUND

9. Dr Toft was a successful and well-reputed "celebrity" knee surgeon who operated out of a private clinic in Munich in business with, I believe, two other surgeons [2]. That clinic was operated through a private limited company, Alpha Klinik GmbH. It entered into insolvency proceedings in 2008. This appears to have been the beginning of Dr Toft's financial difficulties.

10. In early 2010, one of Dr Toft's personal creditors, an architect's firm known as Drexler + Partner Architekten ("Drexler") sought to enforce a judgment of 60,889.24 € debt against Dr Toft using a Gerichtsvollzieher (bailiff). The bailiff did visit Dr Toft's practice at Effnerstraße 39a in Munich but he was told by Dr Toft's lawyer, Dr Thomas Kenmerling on or around 6 April 2010 that Dr Toft was no longer operating as a sole practitioner but rather in a partnership with an Italian citizen, Mr Walter Pascale ("Mr Pascale" and "the Partnership"). He was also informed that Dr Toft had left the country and was residing in the United Kingdom at Flat 1, 17 Chesham Place, London SW1X 8HJ. On 14 May 2010, Drexler filed a bankruptcy petition in the MDIC seeking a bankruptcy order on the basis of Dr Toft's inability to pay debts under section 17 of the German Insolvency Code 1998 (Insolvenzordnung) ("GIC98").

11. On 19 May 2010, I was appointed by the MDIC to provide a report to the court and opine as to whether Dr Toft's centre of main interests was in Germany [3]. I wrote to Dr Toft on 25 May 2010 [4] requesting a meeting with him either in Munich or London (where he now appeared to reside). I received no response to that letter. Equally I have no reason to believe he did not receive it. I then attended his practice at Effnerstraße 39a on 26 May 2010. The receptionist told me that Dr Toft was not in the office at that time, but in an operating theatre elsewhere in Munich. On the same day I visited the clinic I was referred to.

The receptionist there arranged for me to telephone Dr Toft. On the telephone, Dr Toft informed me that he was present at the clinic, but could not see me because he was in the operating theatre and busy with a patient. He informed me that he would call me when he was available, but he never did so, and that was the first and last time I spoke to him.

12. My investigation into Dr Toft uncovered that he worked in Munich one or two days a week, but then spent the remainder of his time in England. I formed the view that his centre of main interests was in Germany on the basis that, although he spent more time in England, he continued to work in Germany, and his medical practice was his primary source of his income. He did appear to have other business activities, in the form of some sort of consultancy arrangement with Arcane Energy Limited ("Arcane") (an English company). I wrote to the director of Arcane on 2 September 2010 requesting whether Dr Toft earned any income from his association with the company [5]. I have received no response to that letter and there is no evidence that Dr Toft made substantial sums out of activities with Arcane. In fact, I now know that Arcane was dissolved on 26 January 2010 [6].

13. On 18 May 2010, the MDIC sent to Dr Toft a standard questionnaire for him to answer, but it has never received any response [7].

14. I produced my initial report for the MDIC on 27 May 2010, setting out my opinion that Germany was the centre of main interests and recommending that interim insolvency proceedings should be opened in Germany [8]. As a result, on 10 June 2010, I was appointed as Dr Toft's Interim Insolvency Administrator [9]. All of Dr Toft's German bank accounts were frozen and he was prohibited from entering into any contracts. All powers to dispose of his assets resided with me. Dr Toft was also under a duty to co-operate with me as his Interim Insolvency Administrator under section 97 GIC98.

15. I sent Dr Toft my own questionnaire on 23 June 2010 [10]. Dr Toft's lawyers responded on 24 June 2010 stating that the information requested could not be provided because of Dr Toft's absence in London [11]. The questionnaire is a standard one used by me and Pluta in all bankruptcy cases. Just as with the court's questionnaire, to date, Dr Toft has failed to answer it.

MW

16. On 7 July 2010, given Dr Toft's lack of co-operation, I applied to the MDIC for mail and email interception orders in relation to Dr Toft's German addresses and email accounts. The court granted this order on 8 July 2010 **[12]**. As a result of this order, I obtained the following information:

    16.1. Dr Toft was receiving substantial credit card payments (of about 80,000 €) from patients for his services through a merchant service known as Elavon Financial Services Limited ("Elavon") which remained undisclosed to me and the MDIC **[13]**.

    16.2. I traced the Elavon payments into an account in the name of the Partnership (with Mr Pascale). I have subsequently learned from Mr Pascale himself that the partnership agreement states that the profits of the Partnership are to be divided 10% to Dr Toft and 90% to Mr Pascale, even though Mr Pascale is not licensed to practise medicine in Germany (and all of the Partnership business is of a medical nature within Germany) **[14]**. I have also learned that Dr Toft has a full mandate to undertake all transactions without limit on the Partnership's account. I have grave suspicions that the Partnership has been established for the sole purpose of putting the income of Dr Toft beyond the reach of his creditors. I am therefore considering whether I can claw back any of sums paid to Dr Toft and my investigations in this regard are ongoing.

    16.3. Elavon has subsequently written to Dr Toft informing him that a payment of 19,187.25 € was made in error into the Partnership account, that the money ought to have been paid to me as Interim Insolvency Administrator, and that he should repay the sums to Elavon **[15]**. As far as I am aware, no response has been received to that letter.

    16.4. Dr Toft also made profits from the licensing of a type of knee bandaging invented by him **[16]**. The profits from this licence were paid into the Partnership account, even though the licensing contract is in Dr Toft's name (not the Partnership's) and the contract pre-dates the establishment of the Partnership.

16.5. A house in Guzargues, near Montpellier, France in which one of his former wives (Mrs Maureen Toft) lives is registered in his name. The house is being offered for sale **[17 and 18]**.

16.6. On 9 February 2010, he sold a house in Les Ardrets, France for 981,500.00 € to a company incorporated in Bosnia Herzegovina called Prevent B.H. d.o.o., which appears to be in the business of automotive supply, and has a German parent company and a Slovenian subsidiary which is now in liquidation **[19 and 20]**. The local housing association has told me that a Lebanese man purchased the house. If the transaction had been for full value, there ought to have been approximately 481,000 € of equity released for Dr Toft. There is no record of these funds from the evidence I have collected in relation to Dr Toft's bankruptcy thus far.

16.7. He also maintains a Swiss residence at Hauptgasse 58, 9050 Appenzell, Switzerland. I telephoned Elmar Neff who is referenced in the email of 24 September 2010 **[21]** and he told me that he is the landlord of the premises and Dr Toft is the tenant. He told me that there are some of Dr Toft's belongings in the flat and I have applied to the Swiss courts and for recognition of my appointment **[22]** and this has now been granted.

16.8. Dr Toft has attempted to register with the General Medical Council in England (which shows that he is not, as of yet, practising medicine in England) **[23]**.

16.9. He has also attempted to purchase a house in the Philippines for approximately 150,000 € (8 million Phillippines peso referred to in an email at **[24]**. I believe that there is a real risk that he will flee to the Philippines to avoid his bankruptcy.

16.10. The Bank informed Dr Toft that his English account was overdrawn on 4 September 2010 **[25]**.

17. Dr Toft was not immediately given notice of the granting of the MDIC orders. However, when his lawyer made enquiries of the MDIC on 28 July 2010 to find

out what orders had been granted, he was told which orders had been issued. Consequently, having knowledge of the mail and email redirection/interception he passed this information on to Dr Toft. As a result the flow of valuable information ceased almost immediately.

18. On 14 July 2010 I applied to the MDIC for an order that Dr Toft, Ms Toft and Mr Pascale were all summoned to be examined. On 15 July 2010, the MDIC made an order that they appear on 4 August 2010 **[26]**. That order was varied on 28 July 2010 to be a summons for examination without delay **[27]**.

19. It appears that around this time Dr Toft sought insolvency advice from an insolvency advisor named Mr Nolte in England, and had arranged to pay the sum of £250 for this advice **[28]**. On the same day, he also appears to have spent £1,500 on a holiday **[29]**.

20. On 16 July 2010 I applied to the MDIC to extend the mail and email interception order to Dr Toft's English address and email. That application was granted on 21 July 2010 (the Munich Order) **[30]**. On 29 July 2010 Dr Toft applied to set aside the mail redirection orders (both the German and English ones) **[31]**. The Judge refused to set them aside and leave to appeal that decision has also been refused on the grounds of Dr Toft's failures to co-operate with the MDIC and me. A full transcript of the Judge's and appeal decisions are exhibited to this statement **[32]**.

21. Prior to the examination, Mr Pascale voluntarily met with me on 1 August 2010, during which time he explained to me the position of the Partnership outlined above. As Mr Pascale had cooperated with me and allowed me to interview him, I discontinued the examination of him.

22. Ms Toft did not appear for her scheduled examination in the MDIC on 4 August 2010. Subsequently I learned that she is not the owner of French property occupied by her mother and that she is not Dr Toft's biological daughter. The advertisement placed by her for the sale of the property was simply an attempt to assist her mother in selling the property. I have discontinued the examination against her.

23. Dr Toft did not appear on 4 August 2010 or otherwise for his examination. On 9 September 2010, the MDIC ordered Dr Toft's arrest in order to enforce the disclosure of information concerning his assets **[33]**.

24. I have also discovered that Dr Toft had been the registered holder of a valuable internet domain name: "knie.de" until 12 March 2010 when the domain name was transferred via a third party (one Norbert Kossmann) to his mother-in-law, Mrs Lila Roy. On 13 August 2010, I obtained a restraining order preventing Mrs Roy transferring that domain name to anyone as I consider that the transfer may be vulnerable as a transaction at an undervalue or preference **[34]**.

25. On 27 September 2010, the MDIC opened full main insolvency proceedings and appointed me as the Insolvency Administrator of Dr Toft **[35]**. The previous orders, such as the Munich Order, expressly remain valid (see paragraph 7 of the order).

**DR TOFT'S CREDITORS**

26. From my investigations thus far, Dr Toft has approximately 110 unsecured creditors who are collectively owed in the region of at least €2 million. I cannot produce a definite list of creditors at this time given the fact that Dr Toft has failed to provide any information to me at all. At **[36]** is a schedule prepared by me of his creditors as I presently understand them to be. It is unlikely that there will be any dividend to creditors in this estate, unless Dr Toft has substantial assets, and I am able to acquire them for the benefit of his creditors.

**THE MUNICH ORDER**

27. I seek by this application a declaration that the Munich Order can be enforced in England and Wales without further formality. The reason I seek this declaration is that the MDIC specifically stated that the Munich Order was made in pursuance of Art. 25(3) of the EC Regulation on Insolvency Proceedings 2000 ("the Regulation"). I understand that this gives the English court discretion whether to recognise the Munich Order or not. I would submit that the Munich Order should be recognised:

    27.1. Dr Toft has shown himself to be extremely uncooperative, and by being so, he has delayed the administration of his bankruptcy giving him time

to attempt to dispose of his assets, hide further income made by him, and possibly even flee Europe. Any further delay in obtaining information would only provide him with more opportunities to frustrate his bankruptcy proceedings.

27.2. The mail and email redirection/interception orders against Dr Toft have already been subject to substantial judicial scrutiny in Germany, most notably in the context of a failed appeal.

28. If the court is inclined not to enforce the Munich Order, then I would humbly submit that the court should exercise its power under section 371 of the Act to make an English order on the same terms as the Munich Order as it relates to Dr Toft's post.

29. Dr Toft maintains an English residence at the Property, which he rents [37]. The freehold is owned by an Isle of Man company, Vega Properties Limited. I do not know whether Dr Toft has a connection with this company or not (beyond the fact that he rents the Property from it).

30. Given the wealth of information that was obtained from the orders made in relation to Dr Toft's German addresses and email accounts, I believe that there is a significant prospect of information being made available by enforcement of the Munich Order (or the grant of an English order on the same terms as it relates to his post) that (a) would otherwise be hidden from me, or not come to my attention; and (b) would result in further assets being found for the benefit of Dr Toft's creditors.

31. For the avoidance of doubt, if the Munich Order is not declared enforceable in as sought, no alternative relief is sought in relation to Dr Toft's email accounts with AOL and GMX.

**SEARCH AND SEIZURE**

32. I also seek an order and issue of a warrant for the purposes of section 365 of the Act for me to enter into the Property. I do not believe that there is anybody in occupation of the Property save for Dr Toft, and presumably his present wife. I believe such an order is appropriate in the circumstances, because of:

32.1. Dr Toft's lack of cooperation with me and the MDIC;

32.2. the amount of information and details of assets that would not have been available to me without the interception measures undertaken in Germany;

32.3. the fact that Dr Toft appears to have conducted a separate consultancy business whilst in England and Wales, which shows there may be evidence of business activities while he was resident; and

32.4. he appears to have been attempting to purchase a property in the Philippines whilst residing in England, which means there may be evidence of such a purchase (and where the funds for the proposed purchase are located) within the Property.

33. Given the fact that Dr Toft has sought to conceal his property and information from me in all of his previous dealings with me and the German courts, I believe there is a genuine prospect that such property and information is concealed at the Property.

**DISCLOSURE OF BOOKS AND RECORDS**

34. I also seek an order requiring the Bank to give me such information and documents they may have in relation to the bank accounts held by it. I do not believe that there are any credit balances but should there be I also ask that such sums are remitted to me.

**FULL AND FRANK DISCLOSURE**

35. I have been advised by my English legal advisors that since this application is made without notice to Dr Toft, I am under an obligation to make "full and frank disclosure" of all relevant facts and matters. I have also been informed by my legal advisors that my representative at the hearing of this application will make such full and frank disclosure regarding any relevant legal arguments that must be brought to the court's attention, but that I should provide full and frank disclosure for any factual issues. I would draw the court's attention therefore to the following points:

35.1. Dr Toft has opposed the making of redirection orders in Germany. As set out above, that attempt failed.

35.2. He has also complained to me about the time it has taken to forward mail on to him that has been first re-directed to me. I can assure this court that I and my offices deal with the mail as quickly as we can and that all post is ultimately forwarded on to Dr Toft. That said, we have delivered to our office a great deal of post and it does require some time to file through it to extract any post relevant to the bankruptcy. I would also say that the mail re-direction is required purely because of Dr Toft's uncooperative approach to his bankruptcy.

35.3. Some mail that has been legally privileged and/or does not belong to Dr Toft has been inadvertently opened by the staff at my offices. It is not always possible to determine from the envelope whether post is mailed to Dr Toft in his personal capacity or as a partner of the Partnership, or whether the contents of it are privileged. I can assure the court that nothing that was contained in such post has been used in support of this application (nor any of the applications before the MDIC).

35.4. GMX is a foreign incorporated company, and both the relevant email servers for GMX and AOL reside outside of this jurisdiction. I would submit that this is not an issue that should impact upon the grant of the declaratory relief sought, but it is for this reason that orders under the Act against these parties are not sought in the alternative.

**CONCLUSIONS**

36. I therefore request this court to grant an order in the form of the draft appended to this application notice, declaring that I can enforce the Munich Orders in England without further formality, permitting me to search and seize relevant information from Dr Toft's English residence, and requiring the Bank to disclose such information as they may hold in relation to Dr Toft's bank accounts.

MP

**Statement of Truth**

I believe, to the best of my knowledge and belief, that the fac[ts in this]
statement are true.

*[signature]*

DR MARTIN PRAGER

Dated: 4 XI 2010

246591

Applicant
M Prager
First
MP1

Date:

APPLICATION NO.

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
IN BANKRUPTCY

IN THE MATTER OF DR JÜRGEN TOFT
AND IN THE MATTER OF THE INSOLVENCY ACT 1986
AND IN THE MATTER OF THE EC REGULATION
ON INSOLVENCY PROCEEDINGS 2000

BETWEEN

DR MARTIN PRAGER
(as Trustee in Bankruptcy of the First Respondent)

<u>APPLICANT</u>

-AND-

(1) DR JÜRGEN TOFT (a bankrupt)
(2) ROYAL MAIL GROUP LIMITED
(3) HSBC BANK PLC

<u>RESPONDENTS</u>

---

**WITNESS STATEMENT OF DR MARTIN PRAGER**

---

BRYAN CAVE
88 Wood Street
LONDON
EC2V 7AJ

Tel:    +44 (0) 203 207 1100
Direct: +44 (0) 203 207 1192
Fax:    +44 (0) 203 207 1881
Email  ian.williams@bryancave.com

Ref:    IGW/89r

<u>SOLICITORS FOR THE APPLICANT</u>

Date:

Application No._____

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
IN BANKRUPTCY

IN THE MATTER OF DR JÜRGEN TOFT
AND IN THE MATTER OF THE INSOLVENCY ACT 1986
AND IN THE MATTER OF THE EC REGULATION ON INSOLVENCY PROCEEDINGS 2000

BETWEEN

DR MARTIN PRAGER

(as trustee in bankruptcy for the First Respondent)

Applicant

-and-

(1) DR JÜRGEN TOFT

(a bankrupt)

(2) ROYAL MAIL GROUP LTD

(3) HSBC BANK PLC

Respondents

**EXHIBIT MP1**

This is the bundle of documents referred to in the Witness Statement of Dr. Martin Prager signed on this ___ day of November 2010 and marked "MP1".

DR. MARTIN PRAGER

247544