**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| DR. JÜRGEN TOFT, | ) | Case No. 11-11049 (ALG) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
_____)

## MEMORANDUM OF OPINION

A P P E A R A N C E S :

HAYNES AND BOONE, LLP
*Counsel for Dr. Martin Prager,*
*Insolvency Administrator in Germany for Dr. Jürgen Toft*
30 Rockefeller Plaza
New York, NY 10112
     By:   Judith Elkin, Esq.

TRACY HOPE DAVIS
*United States Trustee, Region 2*
33 Whitehall Street, 21st Floor
New York, NY 10004
     By:   Elizabetta Gasparini, Esq.

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

     The applicant, Dr. Martin Prager ("Prager" or the "Foreign Representative"), is the insolvency administrator in a proceeding in Germany regarding Dr. Jürgen Toft ("Toft" or "the Debtor"), an orthopedic surgeon who assertedly has debts exceeding 5.6 million euros ($7.6 million) owed to approximately 110 creditors. Prager initiated this chapter 15 proceeding for the purpose of gaining access to Toft's e-mail accounts stored on the servers of two internet service providers ("ISPs") located in the United States. The Verified Petition states that the Debtor

otherwise has no assets in the United States, is not a party to any lawsuits pending in the United States, and is not believed to be currently residing in the United States.  Verified Petition at ¶ 8.

The German proceeding was initiated before the Munich District Insolvency Court (the "German Court") on June 10, 2010.  It is represented that Toft refused to cooperate with the administrator and has in fact secreted his assets and relocated to an unknown country outside of Europe, possibly the Philippines.  On July 8, 2010, in accordance with what is alleged to be common German practice, the German Court entered a "Mail Interception Order" authorizing Prager, as administrator of the German estate, to intercept Toft's postal and electronic mail.[1] Having received information that Toft might have relocated to London, Prager initiated a proceeding on January 28, 2011 in England.  The English High Court of Justice issued an *ex parte* order (the "English Order") on February 16, 2011, which granted recognition and enforcement to the German Mail Interception Order.[2]

The present motion has been filed publicly but requests *ex parte* relief in accordance with what is said to be German (and English) practice.  No notice was provided to the Debtor, and it is requested no notice be required if relief is granted so that the Foreign Representative can continue to investigate the affairs of a debtor whose intransigence, obstructionism, and evasive tactics have allegedly thwarted the German insolvency proceeding.  Prager requests that the Court recognize and "grant comity" to the orders of the German and English Courts and enter an order enforcing the Mail Interception Order in the United States by compelling the ISPs, AOL,

---

[1] Declaration of Foreign Representative, Ex. A and Ex. A-12, Dkt. No. 3.  According to Prager, an application to extend the effect of the Mail Interception Order was granted on July 21, 2010, and an application by Toft to set aside the Mail Interception Order was rejected by the German Court.  *Id.*

[2] Supplemental Brief of the Foreign Representative, Ex. A, Dkt. No. 6.  It appears that the English court held that the relief granted in Germany did not violate English public policy because, under § 371 of the English Insolvency Act of 1986, the Court could enter a mail redirection order similar to the one entered in Germany.  *See* Supp. Brief of the Foreign Representative, ¶¶ 8-12 and Ex. A; English Order at ¶ 20-23, *citing* Case C-444/07, *MG Probud Gdynia sp. z o.o.*, ¶ 30-34, 2010 E.C.R. 00.  The English court also held that there should be no concern about lack of procedural fairness in granting *ex parte* relief, because the Debtor had been able to oppose the Mail Interception Order in the German proceeding, and his challenge was rejected by the German Court.

Inc. and 1&1 Mail & Media, Inc., to disclose to Prager all of the Debtor's e-mails currently stored on their servers and to deliver to Prager copies of all e-mails received by the Debtor in the future.  Prager contends that this relief is available after recognition of the German main proceeding under §§ 1521 and 1507 of the Bankruptcy Code, and that relief is also available prior to recognition under § 1519(a) of the Bankruptcy Code or alternatively under the power of the Court to recognize orders entered in a foreign proceeding.

A hearing was held on the motion on April 5, 2011, at the request of the Court, with the U.S. Trustee present and opposing the motion.  Counsel for the Foreign Representative stated at the hearing that notice had been provided to the ISPs, but neither ISP was represented.  In deciding this motion, it is assumed that the foreign proceedings are in conformity with German and English law in all relevant respects.  There is also no question that German and English insolvency proceedings are ordinarily entitled to recognition in this country, and that Prager is an experienced and accomplished insolvency administrator.  However, through this proceeding, Prager seeks in effect the undisclosed production of past e-mails as well as what can only be described as a wiretap of Toft's future e-mail correspondence.

A bankruptcy trustee would not be entitled to such relief under United States law, and a chapter 15 proceeding cannot ordinarily be pursued without notice to the debtor.  The relief requested would also contravene the protection against disclosure of e-mails by internet service providers contained in the Electronic Communications Privacy Act, 18 U.S.C. §§ 2701, *et seq.,* ("Privacy Act" or "Stored Communications Act"), and would appear to constitute an unlawful interception of electronic communications in transit under the Wiretap Act, 18 U.S.C. § 2511, *et seq*.  Effectuation of the relief sought might subject the Foreign Representative, or his U.S. agents and possibly an ISP disclosing the debtor's e-mails, to U.S. criminal liability.  For the

3

reasons stated hereafter, this is one of the rare cases in which the relief sought by the Foreign

Representative must be denied under § 1506 of the Bankruptcy Code as manifestly contrary to

the public policy of the United States.

## DISCUSSION

Chapter 15 of the Bankruptcy Code, which adopted the substance and most of the text of

the United Nations Commission on International Trade Law ("UNCITRAL") Model Law on

Cross-Border Insolvency ("Model Law"), provides a comprehensive scheme for recognizing and

giving effect to foreign insolvency proceedings.  Chapter 15 contemplates a short and (in most

cases) fairly simple petition for recognition.  11 U.S.C. § 1515.  Where the foreign case is

recognized as a foreign main proceeding,[3] certain relief goes into effect automatically.

11 U.S.C. § 1520.  The Court thereafter has discretion to grant a foreign representative relief as

provided in § 1521, which includes "the examination of witnesses, the taking of evidence or the

delivery of information concerning the debtor's assets, affairs, rights, obligations, or liabilities."

11 U.S.C. § 1521(a)(4).  In addition to relief available after an order for recognition has been

entered, the foreign representative may request preliminary relief under § 1519, in order to

"protect the assets of the debtor or the interests of the creditors" pending the order of recognition.

11 U.S.C. § 1519(a).  Section 1519(a)(3) specifically references § 1521(a)(4) as a form of relief

available on a preliminary, emergency basis.

Section 1507 further provides that the Court is authorized to grant any "additional

assistance" available under the Bankruptcy Code or under "other laws of the United States,"

provided that such assistance is consistent with the principles of comity and satisfies the fairness

---

[3] A "foreign main proceeding" is defined as "a foreign proceeding pending in the country where the debtor has the center of its main interests."  11 U.S.C. § 1502(4).  The Foreign Representative asserts that as to Toft, the proceeding in Germany is a foreign main proceeding and the proceeding in England is a foreign nonmain proceeding.  The statute defines a "foreign nonmain proceeding" as "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment."  11 U.S.C. § 1502(5).

considerations set out in the statute.[4]  The relationship between §1507 and § 1521 is not entirely

clear; one court has stated that such post-recognition assistance is "largely discretionary and

turns on subjective factors that embody principles of comity."  *In re Bear Stearns High-Grade*

*Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 333 (S.D.N.Y. 2008),

*aff'g* 374 B.R. 122 (Bankr. S.D.N.Y. 2007).  In any event, there is no doubt that the relief

available under chapter 15, and particularly additional assistance granted pursuant to § 1507,

should be consistent with the principle of comity.  *See In re Metcalfe & Mansfield Alt. Invs.,* 421

B.R. 685, 697 (Bankr. S.D.N.Y. 2010).  Section 1507 specifically so provides with respect to

"additional assistance," and more broadly, § 1509(b)(3) directs that once a foreign representative

obtains recognition, "a court in the United States shall grant comity or cooperation to the foreign

representative."

      Notwithstanding the direction that a U.S. court grant comity or cooperation to a

recognized foreign representative in insolvency matters, it is also beyond question that, "The

principle of comity has never meant categorical deference to foreign proceedings.  It is implicit

in the concept that deference should be withheld where appropriate to avoid the violation of the

laws, public policies, or rights of the citizens of the United States."  *In re Treco*, 240 F.3d 148,

157 (2d Cir. 2001); *see also Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,

109 F.3d 850, 854 (2d Cir. 1997); *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709,

713 (2d Cir. 1987); *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457

---

[4] Section 1507(b) sets forth several factors for the Court to consider: "whether such additional assistance, consistent
with the principles of comity, will reasonably assure – (1) just treatment of all holders of claims against or interests
in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in
the processing of claims in such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of
property of the debtor; (4) distribution of proceeds of the debtor's property substantially in accordance with the
order prescribed by this title; and (5) if appropriate, the provision of an opportunity for a fresh start for the individual
that such foreign proceeding concerns."  These are five of the six factors that a court was directed to consider in
determining whether to grant relief under former § 304 of the Bankruptcy Code, which was repealed when chapter
15 was adopted.  The sixth factor was comity.

(2d Cir. 1985).  Consistent with the traditional limits of comity, all relief under chapter 15 is

subject to the caveat in § 1506, providing the court with authority to deny the relief requested

where such relief would be "manifestly contrary to the public policy of the United States."

11 U.S.C. § 1506; *In re Ephedra Prods. Liability Litig.*, 349 B.R. 333 (S.D.N.Y. 2006).  The

principal issue in this proceeding is whether the relief Prager seeks would be manifestly contrary

to U.S. public policy.

       The Foreign Representative states that the recognition of the German Mail Interception

Order would not be contrary to U.S. public policy.  He urges that it be given global effect and

ratified in the United States based principally on the fairness of the German procedures and the

principle of comity.  There is authority that relief granted in a foreign insolvency case can be

recognized and given effect in this country.  *See In re Artimm, S.r.l.,* 278 B.R. 832, 843

(Bankr. C.D. Cal. 2002).  But Prager cannot cause this Court to apply the laws of Germany – or

England – in proceedings in this country simply by making an impassioned appeal to comity.

For one thing, foreign procedures are not routinely imported into U.S. law – disclosure here

proceeds in accordance with U.S. practices and principles, and discovery is conducted in U.S.

courts under our rules of civil procedure even when foreign litigants are involved.  *See Societe*

*Nat. Ind. Aerospatiale v. U.S. Dist. Court for S.D. Iowa*, 482 U.S. 522, 546 (1987).[5]  More

generally, courts have a compelling interest in applying the procedural rules of the forum

regarding how proceedings are conducted.  *Texaco Inc. v. Pennzoil Co.,* 784 F.2d 1133, 1156 (2d

Cir. 1986), *rev'd on other grounds,* 481 U.S. 1 (1987); *Adelphia Recovery Trust v. Bank of Am.,*

---

[5] Discovery in aid of foreign litigation is also available in accordance with U.S. practice pursuant to
28 U.S.C. § 1782(a), which provides, in part "[t]he district court of the district in which a person resides or is found
may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in
a foreign or international tribunal, including criminal investigations conducted before formal accusation."
28 U.S.C. § 1782(a).  Section 1782 has been used in connection with insolvency cases.  *See Lancaster Factoring Co.*
*Ltd. v. Mangone*, 90 F.3d 38, 39-43 (2d Cir. 1996) (discovery at request of foreign trustee for use in Italian
bankruptcy case).

*N.A.,* 624 F.Supp.2d 292, 307 (S.D.N.Y. 2009); *Restatement (Second), Conflict of Laws*, § 122

(comment a) (1971).  Certainly, there are limits to the assistance that can be rendered to foreign

proceedings, as recognized by the English courts despite their generous extension of comity in

insolvency matters.  As Lord Hoffmann stated in *Cambridge Gas Trans. Corp. v. Official Comm.*

*Of Unsecured Creditors of Navigator Holdings plc*, [2006] UKPC 26 at ¶ 22 (Privy Council

2006), "it is doubtful whether assistance could take the form of applying provisions of the

foreign insolvency law which form no part of the domestic system."  The sweeping relief

requested by the Foreign Representative is not incorporated into U.S. law merely because of the

principle of comity and because it is available in his home jurisdiction.

      In any event, consistent with the traditional limits of comity, there must be a sufficient

basis for the exercise by a court of its jurisdiction, and the relief requested must not only be

cognizable under U.S. law but not manifestly contrary to U.S. public policy.  For the reasons set

forth hereafter, this Court has jurisdiction respecting the relief Prager seeks, but the relief must

be denied, on public policy grounds.

**I. Jurisdiction**

      The Bankruptcy Court has subject matter jurisdiction over matters that arise under

chapter 15 as core proceedings under 28 U.S.C. §§ 1334 and 157(b)(2)(P).  The German court

has jurisdiction over Toft as a German citizen with assets and creditors there, and the English

court understood Toft to have been physically present in England and/or in possession of assets

there at the time it granted relief.  The petition indicates that Toft's only connection with the

United States is the apparently fortuitous storage of his e-mails on servers operated by ISPs

located in this country.  The petition seemingly concedes that Toft does not have contacts with

the United States sufficient to allow the exercise of *in personam* jurisdiction, *see Int'l Shoe Co.*

7

*v. State of Wash.*, 326 U.S. 310 (1945), and he has no tangible property in the United States over which this Court could exercise traditional *in rem* jurisdiction. The Foreign Representative admits that the foreign debtor does not have a place of business or assets in the United States or a lawsuit pending against him in a federal or state court, but he nonetheless argues that jurisdiction exists to consider this proceeding, particularly as it is "consistent with the interests of justice and convenience of the parties" in the United States, namely the ISPs. Verified Petition, ¶ 7, Dkt. No. 2.

The absence of tangible property or a place of business of a debtor in the United States is not fatal to a case under chapter 15, designed as it is to provide assistance to a foreign proceeding. *See* 11 U.S.C. § 1501(b)(1). Chapter 15 cases begin as ancillary proceedings, in which recognition is sought under § 1504, even when a plenary proceeding may later be brought under a different chapter through § 1511. Section 1528 specifically provides that the foreign debtor must have assets in the United States in order for a plenary case under another chapter to be initiated, leading to the conclusion that the statute contemplates the commencement of a chapter 15 case even where there are no assets of the debtor in the United States.

Prior to the adoption of chapter 15, it was also held that the bankruptcy courts had jurisdiction under § 304 of the Bankruptcy Code to order the examination of witnesses for the purpose of investigating the affairs of a foreign debtor, even where the foreign debtor had no business or assets in the United States.[6] In *In re Gee*, 53 B.R. 891 (Bankr. S.D.N.Y. 1985), the receiver in a Cayman Islands insolvency proceeding brought a petition under § 304 to obtain discovery in the United States regarding the affairs of a business debtor that admittedly held no property in the United States. The Court granted the relief requested, reasoning that although the

---

[6] Section 304, which was repealed when chapter 15 was adopted in 2005, also provided for ancillary proceedings to recognize and give effect to a foreign insolvency proceeding.

traditional basis for bankruptcy jurisdiction is *in rem*, jurisdiction also exists under the Bankruptcy Code over debtors who have no property at all. The broad statutory authority to grant "other appropriate relief" as assistance to a foreign proceeding under § 304(b)(2) was held to be a sufficient basis for the court's exercise of jurisdiction. *Id.* at 899; *see also Cunard S.S. Co. v. Salen Reefer Servs. AB,* 773 F.2d at 455, citing *Angulo v. Kedzep, Ltd.*, 29 B.R. 417, 419 (S.D. Tex. 1983); *In re Hughes,* 281 B.R. 224 (Bankr. S.D.N.Y. 2002); *In re Petition of Brierley*, 145 B.R. 151, 170 (Bankr. S.D.N.Y. 1992).

Chapter 15 is more explicit than § 304 in that it specifically provides that a foreign representative can request discovery in aid of a foreign proceeding. *See* 11 U.S.C. § 1521(a)(4), authorizing discovery after entry of an order of recognition, and § 1519(a)(3), which provides for such relief on an interim, emergency basis pending an order of recognition. The eligibility standards in § 109 for filings under the various chapters of the Bankruptcy Code do not require that a debtor in a foreign proceeding have a place of business or property in the United States. *See also* § 1502(1), defining debtor in a chapter 15 case as "the subject of a foreign proceeding." There is no authority that the adoption of chapter 15 was intended to abrogate the availability of the tools of discovery to foreign representatives, whether or not the foreign debtor has assets in the United States. Based on the plain text of the statute, this Court has jurisdiction over this application for disclosure in connection with Prager's investigation of the Debtor's affairs.

## II. Public Policy Exception of Section 1506

Although chapter 15 creates a process for obtaining discovery in the United States in aid of a foreign insolvency proceeding and promotes the extension of comity to recognized foreign proceedings, relief is not granted if it would be "manifestly contrary" to the public policy of this country. As noted above, public policy is an integral limitation on a court's authority to grant

comity to foreign courts and foreign proceedings, and it is codified in §1506 of the Bankruptcy Code, which provides that "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."

The public policy exception is clearly drafted in narrow terms, as the action must be "manifestly contrary" to the public policy of the United States. The few reported cases that have analyzed §1506 at length recognize that it is to be applied sparingly, and they merit extended analysis. In the first such case, *In re Ephedra Prods. Liability Litig.*, 349 B.R. 333 (S.D.N.Y. 2006), the representative of a foreign main proceeding in Canada sought enforcement of a Canadian Claims Resolution Procedure included in a reorganization scheme in an insolvency case pending in Canada under the Companies' Creditors Arrangement Act. The U.S. District Court had earlier expressed concerned about the Canadian procedures, in that the claims officer had been entitled to refuse to receive evidence and provide parties with an opportunity to be heard. These due process deficiencies had, however, been cured, and the *Ephedra* decision considered only whether the Canadian procedures were contrary to U.S. public policy because they denied claimants the right to a jury trial.

The *Ephedra* court looked to the words of the statute as well as the UNCITRAL Guide to Enactment to the Model Law. United Nations General Assembly, Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency ("the Guide to Enactment"), U.N. Doc A/CN.9/442 (1997).[7] Guide to Enactment ¶¶ 86 – 89. The Guide recognizes that public policy differs from nation to nation and thus that – as applicable to this case – the public policy of the United States may differ from that of Germany. The Guide to Enactment further recognizes that in some nations "the expression 'public policy' may be given a broad meaning in that it might

---

[7] Article 6 of the UNCITRAL Model Law is virtually identical to 11 U.S.C. § 1506 and served as its model.

relate in principle to any mandatory rule of national law." However, it continues by observing that in many states the public policy exception "is construed as being restricted to fundamental principles of law, in particular constitutional guarantees," and it notes that the purpose of the use of the word "manifestly" is "to emphasize that public policy exceptions should be interpreted restrictively and that article 6 is only to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State." *Id.*

Quoting this language, the *Ephedra* court held that the term "manifestly contrary to public policy" was to be invoked only under "exceptional circumstances concerning matters of fundamental importance." It found that foreign judgments are generally granted comity as long as the proceedings in the foreign court "are according to the course of a civilized jurisprudence, *i.e.* fair and impartial." *Ephedra* at 336, citing and quoting the seminal case on comity, *Hilton v. Guyot*, 159 U.S. 113 (1895). The *Ephedra* court also relied on *Ackermann v. Levine*, 778 F.2d 830 (2d Cir. 1986), where "the Second Circuit expressly reaffirmed '[t]he narrowness of the public policy exception to enforcement [of foreign judgments].'" The Court in *Ephedra* concluded that because U.S. courts have generally enforced foreign judgments without regard to whether a jury was available, abrogation of the right to a jury trial connection with the liquidation of claims in a foreign insolvency proceeding does not provide a basis to refuse enforcement of a foreign claims procedure under § 1506.

In *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010), the Court again reached the § 1506 public policy exception in deciding whether to grant comity to a Canadian plan of arrangement that included third-party releases that arguably could not be granted in a U.S. bankruptcy proceeding. It held, "The key determination required by this Court is whether the procedures used in Canada meet our fundamental standards of fairness," and it

concluded that § 1506 did not bar enforcement of the third-party releases because the Canadian

court had statutory authority to grant such relief, the question of the Canadian court's jurisdiction

had been fully litigated and carefully considered in Canada, including on appeal, and "the

procedures used in Canada meet our fundamental standards of fairness." *Id.* at 697.

In the case of *In re Gold & Honey, Ltd.,* 410 B.R. 357, 371 (Bankr. E.D.N.Y. 2009), the

public policy exception of § 1506 was not at issue in connection with an application for

enforcement of a foreign plan or scheme of reorganization – arguably when a request for comity

is particularly compelling. It arose in connection with a chapter 15 petition for recognition

brought by receivers who were appointed in Israel after the commencement of a U.S. chapter 11

case involving the same debtor. The creditor who commenced the receivership in Israel had

appeared in the U.S. case and continued to prosecute its application in Israel despite a finding by

the U.S. court that the automatic stay of § 362 of the Bankruptcy Code prohibited such action

without an order granting relief from the stay. *Id.* at 364. The U.S. court refused to recognize

the foreign proceeding on several grounds, including the public policy exception of § 1506,

holding that recognition of the Israeli proceeding would amount to a reward for an end-run

around the automatic stay.[8]

In the final case in which § 1506 has been subjected to extensive analysis, *In re Qimonda*

*AG Bankr. Litig.*, 433 B.R. 547 (E.D. Va. 2010), the District Court reviewed the cases discussed

above and adopted a three-point test for analyzing the public policy exception. It stated, first,

that the public policy exception is only implicated in cases where there is a conflict between

foreign law and U.S. law or where there is procedural unfairness in the foreign proceeding.

---

[8] Interestingly, the Court nevertheless did grant the secured creditor, on whose behalf the Israeli receivers were acting, prospective relief from the automatic stay, and it held that it would abstain from hearing any issues relating to the U.S. debtor's property in Israel. 410 B.R. at 373. The Court accordingly afforded the Israeli receivers much of the relief to which they would have been entitled after recognition. *See* 11 U.S.C. § 1528.

*Id.* at 568.  If § 1506 is implicated by a conflict of laws, the court should examine whether the

foreign proceeding provided adequate protection to the procedural rights of the parties.

*Id.* at 570.  If a conflict of laws exists but the procedural fairness of the foreign proceeding is not

at issue, then the Court should examine the extent to which taking the requested action under

chapter 15 "would frustrate a U.S. court's ability to administer the Chapter 15 proceeding and/or

would impinge severely a U.S. constitutional or statutory right, particularly if a party continues

to enjoy the benefits of the Chapter 15 proceeding." *Id.*[9]

Based on the foregoing cases, those courts that have considered the public policy

exception codified in § 1506 have uniformly read it narrowly and applied it sparingly, consistent

with the statutory command that the action in question be "manifestly" contrary to U.S. public

policy.[10]  Sparing application of the provision would also indicate that the public policy

exception should ordinarily be resorted to only if another, more specific provision of chapter 15

does not govern the dispute, consistent with the principle that more specific statutory provisions

usually prevail over general provisions.  *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S.

158, 170 (2007); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384-85 (1992).  For

---

[9] There are several additional cases in which the courts have refused to find that certain requested relief would constitute action manifestly contrary to U.S. public policy but in which the provision was not analyzed extensively. *See e.g. In re Fairfield Sentry Ltd.*, 2011 WL 1998374 (Bankr. S.D.N.Y. May 23, 2011);  *In re British Am. Isle of Venice (BVI), Ltd.*, 441 B.R. 713 (Bankr. S.D. Fla. 2010).

[10] It has also been given a narrow reading in the construction of the cross-border insolvency laws of other countries. (Under § 1508 of the Bankruptcy Code, the provisions of chapter 15 are to be interpreted in a manner that promotes consistency with foreign application of similar laws.  11 U.S.C. § 1508.)  Although there does not appear to be any extensive analysis of Article 6 of the Model Law, English courts have recognized that the enactment in that country of the Cross-Border Insolvency Regulations, 2006, included the adoption of the public policy exception of Article 6. *Samsun Logix Corp. v. DEF*, [2009] EWCH 576 (Ch) at ¶ 4.  In addition, the European Insolvency Regulation, which served in some respects as a model for the UNCITRAL Model Law, *see In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 633-34 (Bankr. E.D. Cal. 2006), has a similar public policy exception that permits a member state to refuse to enforce a judgment in an insolvency proceeding if "enforcement would be manifestly contrary to that state's public policy, in particular its fundamental principles or the constitutional rights and liberties of the individual."  Council Regulation (EC) 1346/2000 of 29 May 2000 on Insolvency Proceedings, Art. 25(3) and 26, 2000 O.J. (L 160) 1; *see* Case C-444/07, *MG Probud Gdynia sp. z o.o.*, ¶ 30-34, 2010 E.C.R. 00; *see also* Case C-341/04, *Eurofood IFSC* [2006] ECR I-3813, ¶ 28. In both cases under the European Insolvency Regulation, the public policy exception was sparingly applied, with the decision emphasizing the narrow scope of the statutory exclusion.

example, a court can grant discretionary relief in a chapter 15 case "only if the interests of the

creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C.

§ 1522(a).[11]  Similarly, under 11 U.S.C. § 1521(b), U.S. assets may be entrusted to a foreign

representative for administration in the foreign case only if the court is satisfied that "the

interests of creditors in the United States are sufficiently protected."  In many cases, these

provisions would appear adequate to resolve a dispute arising from a conflict between U.S. and

foreign law, and the public policy exception would not have to be invoked.  It also appears patent

that relief should not be granted or denied in a cross-border case where there is a conflict

between U.S. and foreign law without a conflict of law analysis – *i.e.*, should U.S. or foreign law

be applied to a particular issue based on familiar choice of law principles coupled with (where

appropriate) due regard for the principle of comity.  *See In re Maxwell Commc'n Corp.,*

93 F.3d 1036, 1047 (2d. Cir. 1996).

Notwithstanding that § 1506 is to be narrowly construed and should be applied only

where another, more specific limitation in the statute does not govern, this is one of the rare

cases that calls for its application.  In this case, the issue is not one of fashioning relief in a

manner that "sufficiently protects" all interested parties, as any *ex parte* recognition and

enforcement of the Mail Interception Order would directly contravene the U.S. laws and public

policies analyzed herein.  Similarly, it cannot simply be concluded on application of traditional

conflict of law principles that Germany would have the primary interest in the resolution of the

present matter, as the question is whether the German procedures are in accord with U.S. public

---

[11] The term "sufficiently protected", which appears in § 1522, is not defined by the statute but has been construed by
one court to mean that a court should tailor relief balancing the interests of the foreign representative and those
affected by the relief.  *In re Tricontinental Exchange Ltd.*, 349 B.R. 627, 637 (Bankr. E.D. Cal. 2006).  Chapter 15
uses the term, "sufficiently protected" instead of the term used in the Model law, "adequately protected," and the
U.S. legislative history makes clear that the change was made so as "to avoid confusion with a very specialized legal
term in United States bankruptcy, 'adequate protection.'"  H.R. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 116
(2005).

policy.  The public policy issue must be squarely faced with respect to (i) the manner in which an order of recognition would be entered – without notice to the Debtor – and (ii) the relief sought – that German procedures be given effect in this country regardless of the fact that they exceed traditional limits on the powers of a trustee in bankruptcy under U.S. law and constitute relief that is banned by statute in this country and might subject those who carried it out to criminal prosecution.  In anticipation of the problematic nature of the relief sought, the Court requested that the Foreign Representative submit supplemental briefing on the availability of an order similar to the Mail Interception Order under U.S. law.  Finding the Foreign Representative's arguments unavailing, the Court denies the relief as manifestly contrary to U.S. public policy. We start with U.S. privacy legislation.

    a.   <u>Electronic Communications Privacy in the United States</u>

Electronic communications privacy is subject to comprehensive statutory protection in the United States under (i) the Wiretap Act, 18 U.S.C. § 2511, *et. seq.*, and (ii) the Privacy Act, 18 U.S.C. § 2701, *et. seq.*  Under the Wiretap Act, civil and criminal penalties can be imposed on any person who "intentionally intercepts . . . any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).  A warrant issued in the course of a criminal investigation upon a heightened showing of necessity is required in order to conduct a wiretap lawfully without the consent of one of the parties to the communication.  18 U.S.C. § 2518.  Courts that have applied the provisions of the Wiretap Act to e-mails have held that the clandestine interception of e-mails of an individual, occurring contemporaneously with delivery, constitutes an illegal wiretap.  *See United States v. Councilman*, 418 F.3d 67, 80 (1st Cir. 2005) (holding that for purposes of the Wiretap Act, e-mails can be considered "electronic communications," and the secret redirection of e-mails interception); *see also Pure Power Boot Camp v. Warrior Fitness Boot Camp*,

587 F.Supp.2d 548 (S.D.N.Y. 2008). The Foreign Representative argues that the inspection of e-mails is not a wiretap because the e-mails are inspected after their delivery and not while in transit, but no authority has been provided to support this narrow construction of the Wiretap Act.

In any event, once an e-mail has been delivered, unauthorized access to the contents of the communication is governed by the Stored Communications Act, 18 U.S.C. § 2701, *et seq.,*which is part of the Electronic Communications Privacy Act ("Privacy Act"). *See Pure Power Boot Camp*, 587 F.Supp.2d at 555. The Privacy Act, which is intended to prevent third parties from "obtaining, altering, or destroying certain stored electronic communications," imposes criminal and civil penalties when a person "accesses an electronic communication service, or obtains an electronic communication while it is still in storage, without authorization." *Id.* at 555. The contents of e-mail communications may be released by an ISP only under the specifically enumerated exceptions found in §§ 2702 and 2703 of the Privacy Act. Those exceptions require a search warrant issued under the Federal Rules of Criminal Procedure or a subpoena issued in the course of a criminal investigation.[12] *In re Subpoena Duces Tecum to AOL, LLC*, 550 F.Supp.2d 606, 611 (E.D. Va. 2008), *citing F.T.C. v. Netscape Commc'n Corp.,* 196 F.R.D. 559 (N.D. Cal. 2000) (discovery of e-mails from ISP not available under Fed. R. Civ. P. 45). Indeed, one court has held that the disclosure procedures under the Privacy Act are unconstitutional to the extent they permit warrantless searches of e-mails, because a reasonable expectation of privacy exists and e-mails are subject to the Fourth Amendment's protection from

---

[12] E-mails which are less than 180 days old may only be disclosed to a governmental entity pursuant to a valid warrant issued pursuant to the Federal Rules of Criminal Procedure. 18 U.S.C. § 2703(a). A warrant is also required in all instances when the contents of electronic communications are requested without notice to the subscriber. 18 U.S.C. § 2703(b)(1)(A). After notice to the subscriber, a court order under § 2703(d) may be used to compel disclosure, but such an order "shall issue only if . . . the records . . . are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). A subscriber may challenge disclosure under 18 U.S.C. § 2704(b) within fourteen days of receiving notice.

warrantless searches and seizures. *See United States v. Warshak*, 631 F.3d 266, 288 (6th Cir.

2010). In this case, the Court does not reach any Fourth Amendment issue – among other things,

it is unclear whether the Debtor, a foreign national not located in the United States, would be

entitled to claim the protections of the Fourth Amendment. *See United States v. Verdugo-*

*Urquidez*, 494 U.S. 259 (1990). Nevertheless, without regard to the Debtor's constitutional

rights under the Fourth Amendment, the Privacy Act has been held to apply irrespective of the

foreign nationality of the account holder. *See In re § 2703(d) Order*, 2011 WL 900120, at *7

(E.D. Va. March 11, 2011) (application of 18 U.S.C. § 2703(d) to foreign users involved in

WikiLeaks investigation not an extraterritorial application of U.S. law because statute governs

disclosure by the American service provider).

      The fact that U.S. law differs from German law with respect to the disclosure of e-mail

communications does by itself not mean that the relief sought by the Foreign Representative is

manifestly contrary to U.S. public policy. As many cases have held, foreign law need not be

identical to U.S. law. *See, e.g. In re Treco, 240 F.3d at 158; Ephedra*, 349 B.R. at 336-37; *In re*

*Metcalf & Mansfield*, 421 B.R. at 698-99; *cf. In re Garcia Avila*, 296 B.R. 95, 109 (Bankr.

S.D.N.Y. 2003); *In re Board of Directors of Multicanal S.A.,* 307 B.R. 384, 391 (Bankr.

S.D.N.Y. 2004). Here, however, the relief sought by the Foreign Representative is banned under

U.S. law, and it would seemingly result in criminal liability under the Wiretap Act and the

Privacy Act for those who carried it out. The relief sought would directly compromise privacy

rights subject to a comprehensive scheme of statutory protection, available to aliens, built on

constitutional safeguards incorporated in the Fourth Amendment as well as the constitutions of

many States.[13]  Such relief "would impinge severely a U.S. constitutional or statutory right."

*Qimonda*, 433 B.R. at 570.

Moreover, as discussed below, the powers that the Foreign Representative is seeking to

exercise in this country go far beyond the powers that have traditionally been afforded to a U.S.

estate representative.

b.  Power of an Estate Representative Under U.S. Law

The Foreign Representative argues that the Mail Interception Order can be approved, as

not manifestly contrary to public policy, because the relief requested would be within the usual

powers of a U.S. estate administrator, resembling an examination under Bankruptcy Rule 2004

or a mail redirection order of a type that has been authorized in bankruptcy cases.  However,

there is no basis to conclude that a U.S. bankruptcy trustee could use the procedures available

under the Privacy Act; a trustee in bankruptcy is not entitled to a search warrant under the

Federal Rules of Criminal Procedure because he is "neither a federal 'law enforcement officer'

nor an 'attorney for the government'" as required by Fed. R. Crim. P. 41(a).  *Application of*

*Trustee in Bankruptcy for a Search Warrant*, 173 B.R. 341 (N.D. Ohio 1994).  Nor is there any

authority for the proposition that a trustee in bankruptcy can conduct a criminal investigation.

The Foreign Representative is correct that an examination under Bankruptcy Rule 2004

may be commenced by an *ex parte* motion.  *See e.g. In re Riverside-Linden Inv. Co.*, 99 B.R. 439

(9th Cir. B.A.P. 1989); *In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004).  However, once

an order is entered authorizing a Rule 2004 examination, the proceeding does not remain secret,

as the debtor has knowledge that a bankruptcy case is pending and access to the public docket.

Moreover, civil discovery proceeds by way of the examination of witnesses and production of

---

[13] For a list of states with constitutional provisions specifically protecting the right to privacy, *see* Privacy
Protections in State Constitutions, National Conference of State Legislatures,
http://www.ncsl.org/default.aspx?tabid=13467.

documents through typical discovery devices, which require notice. *See* Federal Rules of Bankruptcy Procedure 2002, 7026-7037, 9014, 9016.

In any event, as stated above, the civil discovery available in the course of a Rule 2004 examination, such as a subpoena *duces tecum* from this Court, could not compel an ISP to produce a subscriber's e-mails. *See In re Subpoena Duces Tecum to AOL, LLC*, 550 F.Supp.2d at 611. Moreover, there is authority that any subpoena issued to obtain production of e-mail correspondence would properly be directed at Toft, rather than the ISPs alone. *See Flagg v. City of Detroit*, 252 F.R.D. 346, 366 (E.D. Mich. 2008) (third-party subpoena against internet service provider problematic in light of the restrictions imposed by the Privacy Act, 18 U.S.C. § 2702(a); proper request for documents should be directed at the party whose consent would be required for lawful disclosure under the statute).

In asking the Court to issue an order compelling disclosure of e-mails based solely on its equitable powers and the alleged intransigence of the Debtor, the Foreign Representative contends that some courts have issued *ex parte* orders providing for a trustee to perform an inspection of the debtor's residence. There appear to be only two reported cases which have granted this relief under the Bankruptcy Code, and in both cases the debtor or a family member was aware of the proceedings and present at the time of the inspection. *In re Bursztyn,* 366 B.R. 353 (Bankr. D. N.J. 2007); *In re Barman*, 252 B.R. 403 (Bankr. E.D. Mich. 2000).[14] By contrast, the Foreign Representative has requested access to the Debtor's e-mails under conditions of total secrecy and by way of a wiretap that is prohibited by statute. In any event, inspection orders

---

[14] The Court in *In re Bursztyn* issued an order granting the bankruptcy trustee *ex parte* relief by authorizing entry into and inspection of the debtor's residence to search, seize, and appraise estate property. *In re Bursztyn*, 366 B.R. at 361-62. However, the trustee personally served the order upon the debtor at her residence. *Id.* at 361. The Court in *In re Barman* also issued an order to allow the bankruptcy trustee to inspect the debtor's property without prior disclosure to the debtor, who had a history of violating court orders and obstructing the litigation process, so that a full and candid disclosure of assets could be made. *In re Barman*, 252 B.R. at 410. However, the debtor's attorney was notified by fax on the morning of the search, and the debtor's wife consented to the search after consulting with her attorney. *Id.* at 411.

have been criticized for their impact on privacy rights and the protections of the Fourth Amendment to the U.S. Constitution.  A. Mechele Dickerson, *Using Criminal Law Remedies to Unearth Hidden Assets*, 10 J. BANKR. L. & PRAC. 541 (2001).

Nor does the requested relief resemble an order permitting the redirection of the mail of an individual debtor engaged in business.  Bankruptcy trustees have been authorized to intercept the mail of a debtor engaged in business so that they can operate the business and investigate the debtor's financial affairs, but the reported cases under the Bankruptcy Code require notice and measures to protect postal secrecy with respect to debtors who are individuals.  For example, *In re Benny*, 29 B.R. 754 (N.D. Cal. 1983), was a Chapter 7 case in which the debtor objected after discovering that the trustee had induced the post office to redirect all mail from his business and his residence without notice to him and without prior court approval.  *Id. at* 757.  The Court held that the trustee's action was inappropriate in light of the intrusion into personal and possibly privileged communications, and said that although the trustee's powers under 11 U.S.C. § 704 include authority to seize and control business-related mail of the debtor, the trustee did not have the authority to redirect the mail of an individual debtor, whether business or personal, without notice to the debtor and an opportunity to object.  *Id.* at 760 - 62.  Similarly, in *In re Crabtree*, 37 B.R. 426, 427 (Bankr. E.D. Tenn. 1984), an involuntary case, the trustee sought an order redirecting mail addressed to the individual debtor after the debtor refused to disclose his assets and liabilities.  After an objection from the debtor, the *Crabtree* court ordered that a neutral third party maintain a record of the mail received and provide the debtor any mail that appeared to be personal or privileged.  *Id.* at 429.[15]

_____

[15] It is also worth noting that one of the reasons the *Crabtree* court authorized the mail redirection was that the business correspondence of a debtor usually contains checks in payment of the accounts receivable of the business, which are property of the estate.  There is no such issue in this case, as the e-mails are sought solely for the purpose

In both *Benny* and *Crabtree*, the courts imposed limits upon the trustee's authority to redirect a debtor's mail, especially with respect to privileged or private communications unrelated to the bankruptcy proceeding, and they recognized the debtor's right to have notice of the proceedings and an opportunity to object.  By contrast, the relief sought by the Foreign Representative goes much further and requests unfettered access to all communications received by the Debtor at the specified e-mail addresses, both past and future.  The Foreign Representative admits that the Debtor may receive privileged communications that would need to be screened, and he states that "nothing contained in such mail will be used to support any motions before any court."  Motion at ¶ 32.  Although procedures could potentially be put in place to protect against disclosure of privileged communications, these procedures would not be sufficient to justify the relief sought herein.

c.  <u>Notice</u>

In addition to requesting authorization to secretly intercept Toft's e-mails, the Foreign Representative asks that the Court refrain from providing the foreign debtor any notice of this chapter 15 proceeding, to keep confidential the investigation of the Debtor's affairs and preserve the possibility of collecting useful information from the Debtor's ongoing use of the e-mail addresses in question.  This relief, too, would be contrary to U.S. law.  Under Bankruptcy Rule 2002(q)(1) the Court is directed to provide notice of a petition for recognition under chapter 15 to the debtor, parties against whom provisional relief is sought under § 1519, and other parties in interest.  Although the Debtor's whereabouts are unknown at this time, it would appear that a first step in providing notice would be to send an e-mail to the addresses that are to be investigated.

---

of obtaining information on Toft's assets and whereabouts, not in order to intercept payments that he might wrongfully convert.

21

As discussed above, every substantive rule of U.S. law need not be followed in a chapter 15 ancillary proceeding.  However, since Bankruptcy Rule 2002(q) was specifically designed for use in chapter 15 cases, it would presumably be a rare case in which its requirements could be disregarded – if they ever could be.  In light of the conclusions set forth above that the relief sought by the Foreign Representative is manifestly contrary to U.S. public policy, this is not such a case.

## CONCLUSION

This is one of the rare cases in which an order of recognition on the terms requested would be manifestly contrary to U.S. public policy, reflected in rights that are based on fundamental principles of protecting the secrecy of electronic communications, limiting the powers of an estate representative, and providing notice to parties whose rights are affected by a court order.  The motion of the Foreign Representative for *ex parte* relief is therefore denied. This is without prejudice to the right of the Foreign Representative to seek recognition of the German proceeding as a foreign main proceeding after providing notice pursuant to Bankruptcy Rule 2002(q) and without prejudice to the grant of other appropriate relief consistent with U.S. public policy thereafter.

IT IS SO ORDERED.

Dated:    New York, New York
          July 22, 2011                        */s/ Allan L. Gropper*
                                               UNITED STATES BANKRUPTCY JUDGE